UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 18-cr-00222 (APM) |
| GERALD MEEKINS, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

On July 24, 2019, a grand jury indicted Defendant Gerald Meekins on one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 1. Defendant now moves to suppress the gun and ammunition he is alleged to have possessed. The government claims that Defendant tossed the loaded gun to the ground as officers approached him, thereby abandoning any expectation of privacy in the weapon. Defendant, on the other hand, argues that the officers lacked reasonable suspicion to seize him and that his alleged tossing of the weapon occurred *after* the illegal seizure. This sequence of events, he contends, makes the gun and ammunition fruit of the illegal seizure and thus subject to suppression. *See* Def.'s Mot., ECF No. 12 [hereinafter Def.'s Mot.].

For the reasons that follow, Defendant's motion is denied.

## II. BACKGROUND

### A. Findings of Fact

The following findings of fact are based on (1) the testimony of Officer Merissa McCaw, the lone witness called by either party during the suppression hearing held on March 1, 2019; (2) evidence presented at the hearing, including body-worn camera footage; and (3) evidence submitted with the parties' pleadings.

On June 26, 2018, at approximately 11:50 p.m., Officers Matthew Hiller, Matthew Mancini, and Merissa McCaw of the Metropolitan Police Department's ("MPD") Narcotics and Special Investigations Division Gun Recovery Unit were on patrol within the Seventh District in the District of Columbia. *See* Tr. of May 1, 2019, Hr'g. on Mot. to Suppress, ECF No. 34 [hereinafter Hr'g. Tr.], at 52–54. The officers were assigned to this area as part of the MPD's "Summer Crime Initiative," a program to increase police presence in parts of the city with the most violent crime. *Id*. at 50–53. The three officers were wearing plain clothes with outer tactical vests marked "POLICE" on the front and back, and they patrolled the area in an unmarked car. *Id*. at 54. Officer Hiller was at the wheel. *Id*. at 55.

While driving westbound on the 2000 block of Savannah Terrace, Southeast, the officers observed Defendant walking alone in the same direction in which they were heading. *Id.* at 54. The officers noticed that Defendant was walking with both hands held close to his body and balled up in front of his waistband. *Id*. Based on this hand position, Officer Hiller slowed the car and pulled up next to Defendant. *Id*. at 54–55. While driving slowly alongside Defendant, through the open window of the police car and separated from Defendant by a row of parked cars, Officer Hiller identified himself as a police officer and asked, "Everything good?" *Id*. at 55, 59. Defendant

replied, "I'm good," and continued to walk with his hands balled in front of his waistband. *Id.* at 55.

Officer Hiller then asked Defendant, "No guns, right?" *Id.* Defendant continued to walk down the street and responded, "I'm just going home." *Id*. at 60. Officer Hiller then asked him, "Do you mind showing me your waistband?" *Id*. At this point, Officer Hiller cast his flashlight on Defendant. *See* Gov't. Hr'g Ex. 1 (Body Cam Footage from Officer McCaw) [hereinafter Ex. 1], at 1:51. Defendant looked down to his waistband and, while keeping his left hand balled in front of his waistband, grabbed but did not lift the right side of his shirt. Hr'g. Tr. at 55, 61.

Officer McCaw testified that the officers, at that time, decided to stop and get out of the car. Their intent was to do a pat-down of Defendant. *Id.* at 56, 149. Officer McCaw deemed Defendant's behavior suspicious because of his "unusual" hand position and walk, and because he had not directly answered whether he had a gun and he had refused to show his waistband. *Id*. at 148. According to Officer McCaw, after Defendant did not lift his waistband, "all of us believed he had a firearm in his waistband." *Id.* at 56.

As Officers Mancini and McCaw got out of the car, both turned on their body-worn cameras, which began recording both audio and video. Ex. 1 at 1:57.[1] Neither officer drew a weapon. Officer McCaw testified that, while rounding a parked SUV, she momentarily lost sight of Defendant and that, upon seeing him again, Defendant had his shirt pulled up with his hands in the air. Hr'g Tr. at 55. While walking towards Defendant, Officer Mancini asked, "Just no gun on you, boss?" *Id*. at 55–56; Ex. 1. at 2:03.[2] With Defendant now having stopped, Officer Mancini

---

[1] The body-worn camera commences audio recording only once officers turn the camera on. As for video, once turned on, the body-worn camera captures for later review contemporaneous events *and* the two minutes prior to activating the camera. Thus, here, the entire encounter with Defendant is captured on video, but the dialogue between Defendant and the officers begins only when the officers turned on the body-worn camera upon leaving the car.

[2] Defendant suggested on cross-examination that Officer Mancini told Defendant to "hold up," but Office McCaw denied that Officer Mancini said those words. *Id.* at 137–38. The court credits Officer McCaw's testimony. Also,

3

continued to approach and said to Defendant, "Can you spread your legs, I'm going to pat you down real quick." Hr'g. Tr. at 115, 138; Ex. 1 at 2:08. Officer McCaw testified that throughout the encounter, the officers and Defendant remained calm, and the video recordings confirm this. Hr'g. Tr. at 59, 96, 102.

Officer Hiller initially remained in the car. After Officers McCaw and Mancini got out and began walking towards Defendant, Officer Hiller saw Defendant reach into his waistband, pull out an object, and make a tossing motion down and away from his body. *Id*. at 56. Officer Hiller then left the car, walked in front of a parked car, pointed his flashlight towards the ground where he had seen Defendant make a tossing motion, and saw what he immediately identified as a firearm. *Id*. Officer Hiller then voiced the Unit's code word for the presence of a firearm, walked towards Defendant, and placed him into a "bear hug," a maneuver designed to prevent the suspect from moving or being able to access a firearm. *Id*. at 101–02; Ex. 1 at 2:11. Officers then handcuffed Defendant and placed him under arrest, and Hr'g. Tr. at 102; Ex. 1 at 2:14, and later seized the firearm, a 9-millimeter handgun loaded with one round of ammunition in the chamber and 12 rounds in the magazine. Hr'g. Tr. at 70.

### B. Procedural Background

Defendant filed his motion to suppress physical evidence on December 14, 2018, to which the Government responded. Def.'s Mot.; Gov't Opp'n, ECF No. 13; Gov't Am. Opp'n, ECF No. 17 [hereinafter Gov't Opp'n]. At the court's request, Defendant submitted supplemental briefing in March 2019. *See* Def.'s Reply to Gov't Opp'n., ECF No. 18 [hereinafter Def.'s Reply]. The court held an evidentiary hearing on May 1, 2019. *See* Minute Entry for May 1, 2019. At the hearing, the court heard from one of the officers who arrested Defendant, Officer Merissa McCaw,

---

Defendant did not raise this as a contested issue of fact in his post-hearing brief. *See* Def.'s Post-Hearing Mem., Def.'s Post-Hearing Reply.

and viewed video and audio footage from the body-worn cameras of Officers McCaw, Hiller, and Mancini. Hr'g. Tr. at 71–72. This footage was admitted into evidence as Government's Exhibits 1, 2, and 3, respectively. *Id*. Both parties submitted supplemental briefings following the hearing. *See* Gov't Post-Hearing Supp. Opp'n, ECF No. 37 [hereinafter Gov't Post-Hearing Opp'n.]; Def.'s Post-Hearing Supp. Mem., ECF No. 38 [hereinafter Def.'s Post-Hearing Mem.]; Gov't Post-Hearing Supp. Reply, ECF No. 39 [hereinafter Gov't Post-Hearing Reply]; Def.'s Post-Hearing Supp. Reply, ECF No. 40 [hereinafter Def.'s Post-Hearing Reply].

## III. CREDIBILITY DETERMINATION

As stated above, at the evidentiary hearing, the government presented the testimony of Officer McCaw. Defendant presented no witnesses but did cross-examine Officer McCaw on a number of issues. In its post-hearing briefings, Defendant does not contest any issues of fact. *See generally* Def.'s Post-Hearing Mem.; Def.'s Post-Hearing Reply. Nor does his post-hearing submission assert that Office McCaw's testimony was not credible.

Defendant argued at the evidentiary hearing that a prior adverse credibility finding against Officer Hiller, who was at the scene but did not testify at the hearing, should bear on the credibility of Officer McCaw. Hr'g Tr. at 9–12. He renews this argument in his post-hearing brief, and he adds that adverse credibility findings against Officer John Wright, an officer who was "assigned to [Officer McCaw's] car" but was not present for Defendant's arrest and who did not testify at the hearing, should also be considered. Def.'s Post-Hearing Mem. at 1.

The court credits the testimony of Officer McCaw, because it finds her account credible, unrefuted, and corroborated by the video evidence. With regard to Defendant's argument that the court should take account of adverse credibility findings pertaining to non-testifying officers, it is

5

a "bridge too far to somehow impute that taint to the government" when neither officer in question testified. Hr'g. Tr. at 24.

## IV. DISCUSSION

The precise time of Defendant's seizure in this case dictates whether he had a valid Fourth Amendment interest in the recovered weapon. "When an individual abandons property, he forfeits any reasonable expectation of privacy in it." *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990); *see also California v. Hodari D.*, 499 U.S. 621, 629 (1991) (holding that "cocaine abandoned while [defendant] was running [and before he was seized] was . . . not the fruit of a seizure" and could not be suppressed). However, if there is a "direct nexus" between an illegal seizure and the act of abandoning the property, the property remains subject to suppression. *United States v. Wood*, 981 F.2d 536, 541 (D.C. Cir. 1992). For example, in *United States v. Wood*, the D.C. Circuit affirmed suppression of a gun dropped by a defendant after police had unlawfully ordered him to "halt right there." *Id.* at 537. Although the defendant had discarded the weapon, the court held that "a direct nexus [existed] between the illegal seizure and the recovery of the weapon." *Id.* at 541. Similarly, in *United States v. Brodie*, the defendant submitted to a show of authority and placed his hands on a car. 742 F.3d 1058, 1060–61 (D.C. Cir. 2014). The defendant then ran and, while doing so, discarded three weapons. *See id.* The court found the defendant's seizure unlawful and ordered the weapons suppressed, even though they were abandoned during flight, because their recovery was not sufficiently attenuated from the initial illegal stop. *See id.* at 1063–64. As these cases demonstrate, the D.C. Circuit will "not treat an item as voluntarily abandoned when a person discards it 'due to the unlawful activities of police officers, as where the disposal was prompted by police efforts to make an illegal arrest or search.'"

*United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017) (quoting 2 Wayne R. LaFave et al., Criminal Procedure § 3.2(h) (4th ed. 2016)).

Defendant contends he was seized when, "after the officers' questions [were] not answered and their request for consent to search was rebuffed, they escalate[d] the encounter by exiting their car . . . thereby conveying that they will not take no for an answer." Def.'s Post-Hearing Reply at 1. Thus, he contends, when the officers left the car, they were "communicating that he was no longer free to ignore them," and he "submitted by stopping," *before* discarding the gun. Def.'s Post-Hearing Mem. at 5. The government, on the other hand, contends Defendant's seizure occurred later in time. Specifically, it argues that law enforcement stopped Defendant only when Officer Mancini asked Defendant to spread his legs for a pat down, which occurred *after* Defendant tossed the gun. *See* Gov't Post-Hearing Opp'n. at 9.

This case is similar to, but not on all fours with, *United States v. Gross*. Like this case, *Gross* involved officers of the Gun Recovery Unit questioning a suspect walking on a sidewalk about possessing a gun while driving alongside him in an unmarked police car. 784 F.3d 784, 785–86 (D.C. Cir. 2015). While in the car, the officers identified themselves as police, asked the defendant if he had a gun ("[H]ey, it is the police, how are you doing? Do you have a gun?"), and asked to see his waistband ("Can I see your waistband?"). *Id*. at 785. The defendant did not respond but lifted his jacket slightly to show his left side. *Id.* at 785–86. The officers then stopped the car and one of them got out and asked whether he could search the defendant ("[H]ey man, can I check you out for a gun?"). *See id.* at 786. The defendant then ran and, once caught, an officer frisked him and found a gun in his waistband. *See id.* The Circuit concluded that the officers' questioning of the defendant while they remained in the car did not constitute a seizure; thus,

7

recovery of the gun after he fled was not unlawful. *Id*. at 788. So, just as in *Gross*, Defendant was not seized while officers questioned him about a gun while driving alongside of him.

The court in *Gross* did not, however, answer the question presented here: Is a suspect seized the moment officers get out of a car and ask whether the suspect will submit to a search, after initially questioning the suspect from the car about his possession of a weapon? *See id.* (stating that defendant did not challenge the district court's finding that the "circumstances did not subsequently ripen into a seizure when [the officer] exited the police car and asked if he could check [the defendant] for a gun").

The Circuit addressed the question left unanswered in *Gross* in *United States v. Miller*, albeit in an unpublished disposition. *See* 739 Fed. App'x 6 (D.C. Cir. 2018). *Miller* likewise involved Gun Recovery Unit officers driving an unmarked car while questioning whether a suspect had a gun. *See United States v. Miller*, No. 16-CR-0072 (KBJ), 2016 WL 8416761, at *2 (D.D.C. Nov. 11, 2016), *aff'd*, 739 Fed. App'x 6 (D.C. Cir. 2018). The officers drove alongside the suspect and a companion as they walked down the sidewalk, identified themselves as police, and asked if the men were carrying any firearms. *Id*. The defendant replied, "no," lifted the back of his jacket to reveal his rear waistband, and continued walking. *Id*. Two of the officers then left the car and approached the defendant asking, "Hey man can I talk to you?" and "Hey, man, do you have any firearms on you?" *Id*. In response, the defendant turned away from the officers and again showed his rear waistband. *Id*. at *3. The officers asked the defendant to turn around and again asked whether he had a gun, at which point he confessed he did. *Id*. The district court concluded that Miller was seized neither when officers called to him while inside the car nor when they got out of the car. *Id*. at *7–9. He became seized, the trial court held, only when the officer physically restrained him in a chest-to-chest bear hug to effectuate the arrest. *Id*. at *9–10. The Circuit

8

agreed. It held that "the district court's determination that Miller was not seized when an officer exited the vehicle and questioned him is consistent with our precedents." *Miller*, 739 Fed. App'x at *7.

*Miller* is virtually indistinguishable from this case. In both cases, Gun Recovery Unit officers asked the defendants questions while driving slowly in a car, including requesting that the defendant show his waistband to prove he is not carrying a weapon. The officers in both cases then left their cars, approached the defendant, and continued to ask questions about gun possession. Those facts did not give rise to a seizure in *Miller*. So, too, here.

This court shares the concern, expressed by Judge Brown in *Gross*, that not treating these types of encounters as "seizures" under the Fourth Amendment means that individuals who encounter Gun Recovery Unit officers often face a false choice: "'voluntarily' acquiesce to the officers' request or [] have any reaction to the officers' inquiries—regardless of how objectively benign—serve as the factual predicate justifying a *Terry* search." *Gross*, 784 F.3d at 791 (Brown, J., concurring). This court is not at liberty, however, to depart from the Circuit's holdings in *Gross* and *Miller*. Under those precedents, Defendant was not seized until Officer Mancini ordered him to spread his legs to prepare for a pat down. He had tossed the gun by this point, thereby forfeiting any privacy interest in it. Defendant's motion is therefore denied.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motion to suppress physical evidence, ECF No. 12, is denied.

Dated: August 13, 2019

Amit P. Mehta
United States District Court Judge

9